# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE ROMAN CATHOLIC DIOCESE OF PATERSON, NEW JERSEY, FATHER MANUEL ALEJANDRO CUELLAR CEBALLOS, FATHER REGIN NICO DELA CRUZ QUINTOS, FATHER JOEMIN KHARLO CHONG PARINAS, FATHER ARMANDO DIAZ VIZCARA JR., and FATHER JOSEPH ANTHONY AGUILA MACTAL,<br><br>Plaintiffs.<br><br>-v-<br><br>U.S. DEPARTMENT OF STATE,  U.S. DEPARTMENT OF HOMELAND SECURITY,  U.S. CITIZENSHIP AND IMMIGRATION SERVICES, ANTHONY BLINKEN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF STATE, ALEJANDRO MAYORKAS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY, and UR MENDOZA JADDOU, IN HER OFFICIAL CAPACITY AS DIRECTOR, U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>Defendants. | CIV. NO.: _____<br><br><br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND JURY DEMAND** |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, THE ROMAN CATHOLIC DIOCESE OF PATERSON ("Plaintiff-1"), a nonprofit religious jurisdiction within the Roman Catholic Church with jurisdiction over Roman Catholics encompassing Passaic, Morris, and Sussex Counties, New Jersey, FATHER MANUEL ALEJANDRO CUELLAR CEBALLOS ("Plaintiff-2"), FATHER REGIN NICO DELA CRUZ

QUINTOS ("Plaintiff-3"), FATHER JOEMIN KHARLO CHONG PARINAS ("Plaintiff-4"), FATHER ARMANDO DIAZ VIZCARA JR. ("Plaintiff-5"), and FATHER JOSEPH ANTHONY AGUILA MACTAL ("Plaintiff-6"), (hereinafter referred to collectively as "Individual-Plaintiffs") (collectively referred to with Plaintiff-1 as "Plaintiffs"), Roman Catholic Priests for the Roman Catholic Diocese of Paterson, bring this action, by and through their Counsel, Norris McLaughlin, P.A., against Defendants, the United States Department of State ("Defendant-DOS"), the United States Department of Homeland Security ("Defendant-DHS"), United States Citizenship and Immigration Services ("Defendant-USCIS"), ANTHONY BLINKEN, in his official capacity as Secretary of the United States Department of State ("Defendant-Blinken"), ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security ("Defendant-Mayorkas"), and UR MENDOZA JADDOU, in her official capacity as Director of United States Citizenship and Immigration Services ("Defendant-Jaddou") (hereinafter referred to collectively as "Defendants"), and complain as follows.

## PRELIMINARY STATEMENT

1.      Individual-Plaintiffs, devoted Roman Catholic Priests for the Roman Catholic Diocese of Paterson, entered the United States at various times as nonimmigrant religious workers for the purpose of engaging in and pursuing their religious vocation and to selflessly serve their community through religious service and leadership as Roman Catholic Priests.

2.      Individual-Plaintiffs entered the United States and continue to remain in the United States pursuant to nonimmigrant visa classification as religious workers which allow Individual-Plaintiffs to continue in service as Roman Catholic Priests without unlawful or unconstitutional interruption from the Defendants nor any other department or agency of the United States.

3.     Plaintiff-1, the Roman Catholic Diocese of Paterson, is a nonprofit religious organization pursuant to Section 501(c)(3) of the Internal Revenue Code.  A jurisdiction within the global Roman Catholic Church with its headquarters in the United States, Plaintiff-1 serves the counties of Passaic, Morris, and Sussex, New Jersey.  Plaintiff-1 relies on its Roman Catholic Ministers and Priests, including an increasing reliance upon foreign-born clergy, to carry out its mission of serving those in need.  The local expression of the universal Church is faith, worship, and service, Plaintiff-1 operates Roman Catholic Churches, Catholic schools, Catholic colleges and universities, and other Roman Catholic organizations including Catholic charities throughout Passaic, Morris, and Sussex, New Jersey.

4.     Plaintiffs seek urgent recourse before this Honorable Court to hold Defendants accountable for misinterpretation and misapplication of the law, which has directly harmed and will continue to irreparably harm Individual-Plaintiffs, Roman Catholic Priests, who now count the days until they have no lawful choice but to abandon their congregations in the United States. Plaintiff-1 likewise seeks urgent recourse for Defendants' discriminatory regulations, policies, and practices that directly, and in clear violation of the United States Constitution, interfere with and chill Plaintiff-1's right to select and employ ministers and religious workers of its choice.

5.     Plaintiffs challenge the March 28, 2023, administrative action of Defendant-DOS, enforced by Defendant-DHS and Defendant-USCIS, that was arbitrary, capricious, misguided, unlawful, conducted without notice or comment, and constitutes an incorrect interpretation of the Immigration and Nationality Act ("INA" or the "Act").  The unlawful administrative action and misinterpretation of the Act results in a recalculation of employment-based visa availability for certain nonimmigrants including Individual-Plaintiffs, resulting in significant delays and hardship to Plaintiffs as more fully set forth in this Complaint.

6. Defendant-DOS' March 2023 misinterpretation of the Act concerning certain individuals who are subject to the Employment-Based Fourth Preference Category ("EB-4"), directly and adversely harms Plaintiffs, though for different reasons. See Defendant-DOS Public Notice 11985, Employment-Based Preference Immigrant Visa Final Action Dates and Dates for Filing for El Salvador, Guatemala, and Honduras (March 21, 2023), https://travel.state.gov/content/dam/visas/SIVs/EB-4-Federal-Register-Advance-Notice-3-22-2023.pdf; subsequently published in the Federal Register at 88 Fed. Reg. 18252 (Mar. 28, 2023) (hereinafter referred to as "88 Fed. Reg. 18252").

7. This civil action asserts that in March of 2023, Defendant-DOS acted arbitrarily and capriciously when it imposed an unfounded and unsupported interpretation of the Act as it relates to visa availability for individuals and subject to the EB-4 preference category and employers who must rely upon the EB-4 preference category for their workers. The recent and sudden agency action governing the calculation of visa availability and allocation by Defendant-DOS was conducted without proper notice, failed to provide for a proper period of comment, exceeded the authority of Defendant-DOS, and directly threatens Individual-Plaintiffs' ongoing ability to carry out their religious and spiritual vocation. In doing so, Defendant-DOS acted in a manner certain to disrupt countless religious workers, forcing Individual-Plaintiffs to either violate the terms of their nonimmigrant visa or face imminent and abrupt departure the United States without any knowledge as to when, or even if, Individual-Plaintiffs will return to the United States.

8. This agency action was posted in the Federal Register on March 28, 2023, and took effect on May 1, 2023, providing the public no notice or comment period prior to its effective date. This action necessarily resulted, and will continue to result, in extraordinary and adverse legal consequences for Individual-Plaintiffs, who will be forced to abruptly end specific religious

assignments as Individual-Plaintiffs' consecrated vows to the Roman Catholic Church so require and be forced to leave the United States or otherwise overstay any lawful period of authorized stay in the United States in violation of the Act.  Each Individual-Plaintiff faces two equally damning options: 1) remain unlawfully in the United States, incurring, inter alia, administrative sanctions that will preclude future qualification for lawful permanent residence in the United States, or 2) depart the United States against the clear direction of Individual-Plaintiffs' religious vocation and directives, abandon thousands of Roman Catholics that each Individual-Plaintiff spiritually guides, and wait years, if not decades, outside of the United States before having any ability to seek readmission to  the United States to return to their religious calling.  See 8 C.F.R. § 1245.2(a)(4).

9.      Defendant-DOS, through its actions related to the March 2023 misinterpretation of the Act, failed to provide the appropriate notice and public comment period for a substantive rule published in the Federal Register, and therefore violated the Administrative Procedures Act (the "APA").

10.      Defendants' initiation and enforcement of the March 2023 agency action infringes upon Plaintiffs' constitutional rights and accompanying liberty interests to freely exercise and practice their religious belief, constituting a substantial burden on Plaintiffs' religious exercise in violation of the Religious Freedom Restoration Act.

11.      Likewise, Plaintiff-1 seeks urgent recourse concerning current regulations, policies, and practices enforced by Defendants, including the unlawful March 2023 agency action, which discriminate against religious employers in the United States.  Plaintiff-1 exercises and in fact advances its religious calling through the employment of foreign-born ministers and religious workers.  In doing so, Plaintiff-1 relies upon the fair and effective application of law by the United

States Government, by and through Defendants, to select and employ ministers and religious workers in the Roman Catholic Diocese of Paterson, New Jersey.

12.     Plaintiff-1 relies on Individual-Plaintiffs to carry out a Roman Catholic religious mission to spiritually serve hundreds of thousands of Roman Catholics under Plaintiff-1's jurisdiction, as prescribed and declared by the leader of the Roman Catholic Church, the Pope, who serves as the Bishop of Rome, and to him, the leadership of the Roman Catholic Church was duly conferred as directed by Canon Law.  Accordingly, Defendants have violated the First Amendment of the United States Constitution's Free Exercise and Establishment Clauses, the Due Process and Equal Protection clauses, the Religious Freedom Restoration Act, the Immigration and Nationality Act, and the Administrative Procedures Act, as discussed in further detail infra.

13.     Plaintiffs now seek redress from this Honorable Court, including an Order that preliminarily enjoins Defendants' joint enforcement of the sudden reinterpretation of the Act pending the outcome of this action, which urgently seeks relief as set forth herein.

14.     Individual-Plaintiffs face and will continue to face essentially identical harms directly resulting from Defendants' actions, which will further cause irreparable and immediate harm to all Individual Plaintiffs and similarly situated individuals if not immediately redressed. The abrupt shift in the calculation of visa availability and sudden enforcement of that agency action imposes substantial burdens on Plaintiffs and their ability to engage in their religious service without significant and substantial interruption by the federal government.  Further, Plaintiffs will necessarily be deprived of their ability to engage in their religious vocation in the United States and will face significant undue disruption, cost, and delay relating to their respective immigration matters, including undue costs, legal fees, travel expenses, and the loss of their right to freely practice and exercise their religion as directed.  Individual Plaintiffs, Roman Catholic Priests, will

-6-

imminently be barred from serving the thousands of United States Citizen congregants for whom they actively and currently provide crucial religious guidance and support.

15.     Moreover, Plaintiff-1 specifically faces ongoing, disruptive, costly, discriminatory, and unconstitutional enforcement of laws and regulations by Defendants which violate Plaintiff-1's right to select and employ the ministers and religious workers of its choosing.

16.     The unfounded and unlawful actions of Defendants cause direct and significant harm to Plaintiffs and the faithful congregants they serve, which can be redressed only by the relief urgently requested.  Therefore, Plaintiffs, through the within action, faithfully complain as follows and pray for urgent injunctive and declaratory relief.

## **JURISDICTION**

17.     Jurisdiction is vested with this Court pursuant to the United States Constitution. See U.S. CONST. art. III, § 2.

18.     Plaintiffs bring their claims pursuant to the Act, codified at Title 8, Sections 1101, et seq., United States Code, the APA, codified at Title 8, Sections 701, et seq., United States Code, Title 5 of the United States Code, and the Declaratory Judgment Act, codified at Title 28, Sections 2201-02, United States Code.  This action also seeks relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

19.     This case does not involve a challenge to any discretionary action that deprives this Court of jurisdiction, but rather involves imperative questions of law, the interpretation of which continues to harm countless Roman Catholics in New Jersey and across the United States absent immediate intervention of this Court.

20.     Jurisdiction is further vested with this Court pursuant to Title 28, Section 1331, United States Code, as this matter involves a federal question related to laws and regulations of the United States of America.  28 U.S.C. § 1331 (granting subject matter jurisdiction to federal courts in civil actions "arising under the Constitution, laws, or treaties of the United States."); see also Bowen v. Massachusetts, 487 U.S. 879, 891 n.16 (1988) ("[I]t is common ground that if review is proper under the APA, the District Court has jurisdiction under 28 U.S.C. § 1331.").

21.     The United States government has waived its sovereign immunity over the claims raised here pursuant to the APA, codified at Title 5, Sections 701, et seq., United States Code.

## VENUE

22.     Venue is proper before this Court pursuant to Title 28, Section 1391I(1), United States Code, in that this is a Complaint against officers and employees of the United States of America acting in their official capacities and is brought in the Judicial District of this Court in which all Plaintiffs reside, and for which the claim does not involve real property.

## PARTIES

23.     Plaintiff-1, the Roman Catholic Diocese of Paterson, New Jersey, is a nonprofit religious organization with a principal place of operation of 777 Valley Road, Clifton, New Jersey 07013.  Plaintiff-1 exercises religious jurisdiction as part of the Roman Catholic Church, the largest denomination of the Christian faith in the world.  In its jurisdiction of Passaic, Morris, and Sussex counties, Plaintiff-1 operates many parishes, Catholic schools, and charitable agencies.

24.     Plaintiff-2, Father Manuel Alejandro Cuellar Ceballos, a Roman Catholic Priest with the Roman Catholic Diocese of Paterson, is a resident of Passaic County, New Jersey, and a citizen of Colombia.  Plaintiff-2 is the beneficiary of an approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, which classified Plaintiff-2 as an immigrant

-8-

religious worker.  The approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, allows Plaintiff-2 to adjust status to that of a lawful permanent resident of the United States. See INA §§ 101(a)(27), 203(b); 8 U.S.C. §§ 1101(a)(27), 1153(b)(4).  **Plaintiff-2's R-1 nonimmigrant classification expires on May 4, 2025.**

25.     Plaintiff-3, Father Regin Nico Dela Cruz Quintos, a Roman Catholic Priest with the Roman Catholic Diocese of Paterson, is a resident of Passaic County, New Jersey, and a citizen of the Philippines.  Plaintiff-3 is the beneficiary of an approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, which classified Plaintiff-3 as an immigrant religious worker. The approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, allows Plaintiff-3 to adjust status to that of a lawful permanent resident of the United States. See INA §§ 101(a)(27), 203(b); 8 U.S.C. §§ 1101(a)(27), 1153(b)(4).  **Plaintiff-3's R-1 nonimmigrant classification expires on May 14, 2025.**

26.     Plaintiff-4, Father Joemin Kharlo Chong Parinas, a Roman Catholic Priest with the Roman Catholic Diocese of Paterson, is a resident of Morris County, New Jersey, and a citizen of the Philippines.  Plaintiff-4 is the beneficiary of an approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, which classified Plaintiff-4 as an immigrant religious worker. The approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, allows Plaintiff-4 to adjust status to that of a lawful permanent resident of the United States. See INA §§ 101(a)(27), 203(b); 8 U.S.C. §§ 1101(a)(27), 1153(b)(4).  **Plaintiff-4's R-1 nonimmigrant classification expires on May 14, 2025.**

27.     Plaintiff-5, FATHER ARMANDO DIAZ VIZCARA JR., a Roman Catholic Priest with the Roman Catholic Diocese of Paterson, is a resident of Morris County, New Jersey, and a citizen of the Philippines.  Plaintiff-5 is the beneficiary of an approved Form I-360, Petition for

Amerasian, Widow(er), or Special Immigrant, which classified Plaintiff-5 as an immigrant religious worker. The approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, allows Plaintiff-5 to adjust status to that of a lawful permanent resident of the United States. See INA §§ 101(a)(27), 203(b); 8 U.S.C. §§ 1101(a)(27), 1153(b)(4). **Plaintiff-5's R-1 nonimmigrant classification expires on May 19, 2025.**

28.     Plaintiff-6, Father Joseph Anthony Aguila Mactal, a Roman Catholic Priest with the Roman Catholic Diocese of Paterson, is a resident of Passaic County, New Jersey, and a citizen of the Philippines.  Plaintiff-6 is the beneficiary of an approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, which classified Plaintiff-6 as an immigrant religious worker.  The approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, allows Plaintiff-6 to adjust status to that of a lawful permanent resident of the United States. See INA §§ 101(a)(27), 203(b); 8 U.S.C. §§ 1101(a)(27), 1153(b)(4). **Plaintiff-6's R-1 nonimmigrant classification expires on April 7, 2026.**

29.     Defendant-DOS is a Department of the Executive Branch of the United States government.  Defendant-DOS is responsible for implementing and enforcing the country's foreign policy interests.  Defendant-DOS is responsible for setting and overseeing implementation of the policies and procedures employed by the agency and all its subdivisions, including the National Visa Center.  Its principal place of business is 2201 C St NW, Washington, DC 20451.

30.     Defendant-DHS is a Department of the Executive Branch of the United States government.  Defendant-DHS oversees the United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.  Its principal place of business is 245 Murray Lane S.W., Washington, DC 20528.

31.     Defendant-USCIS is a sub-component or agency within the United States Department of Homeland Security.  Its principal place of business is 20 Massachusetts Avenue NW, Washington, DC 20001.

32.     Defendant Anthony Blinken is the Secretary of the United States Department of State.  Defendant-Blinken is responsible for the formulation and execution of United States foreign policy and for the delegation of adjudicatory and discretionary authority to other employees of the United States Department of State pursuant to, inter alia, Title 8, Section 1104, United States Code. This action is filed against Defendant-Blinken in his official capacity.

33.     Defendant Alejandro Mayorkas is the Secretary of the United States Department of Homeland Security.  Defendant-Mayorkas is responsible for the enforcement of the Immigration and Nationality Act and for the delegation of adjudicatory and discretionary authority to other employees of the Defendant-DHS and Defendant-USCIS pursuant to Title 8, Section 1103(a), United States Code and Title 8, Section 2.1, Code of Federal Regulations.  This action is filed against Defendant-Mayorkas in his official capacity.

34.     Defendant Ur M. Jaddou is the Director of Defendant-USCIS and is an official generally charged with supervisory authority over all operations of Defendant-USCIS under Title 8, Section 103.1, Code of Federal Regulations.  This action is filed against Defendant-Jaddou in her official capacity.

35.     Defendants are jointly charged by law with the statutory and regulatory obligation to interpret and enforce the law governing the processing, calculation, and enforcement of applications for immigration benefits.  See Homeland Security Act of 2002, Pub. L. No. 107-296 § 401, 116 Stat. 2135, 2178 (2002); INA § 101, 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. § 1101); 22 C.F.R. § 42.51.

## STANDING

36.     Plaintiffs demonstrate two extreme and distinct injuries, each of which constitutes an injury in fact for purposes of standing.  First, Individual-Plaintiffs have an actual and well-founded fear that the ability to remain in the United States with their religious congregations and secure lawful permanent residence is directly threatened and imminently jeopardized as a result of the sudden action and enforcement of Defendants' regulatory changes.  See Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392-93 (1988).  Similarly, Plaintiff-1 demonstrates a well-founded fear of harm to its ability to continue service to the Roman Catholic community within its jurisdiction, as the Roman Catholic Priests upon whom Plaintiff-1 relies are being forced to leave the United States as a direct result of Defendants' regulatory changes.  Plaintiff-1 likewise suffers ongoing discrimination as a religious employer as Defendants' interpretation, implementation, and enforcement of the Act necessarily affords additional rights, privileges, and benefits to non-religious employers, in direct violation of Plaintiff-1's constitutional right to select and employ ministers and religious workers consistent with Plaintiff-1's sacred mission.

37.     Second, Plaintiffs, collectively, have already suffered concrete harm because of the challenged interpretation of the statute in question.  The March 2023 misinterpretation of the Act has compelled Plaintiffs to take costly and burdensome measures to protect the legal interests to remain in the United States and maintain the ability to serve the Roman Catholic community in New Jersey, which are relevant and necessary to Plaintiffs' religious vocation, expression, and declared responsibilities as directed by the Bishop of Rome, the Pope – rights guaranteed under the First Amendment of the United States Constitution.  See U.S. CONST. amend. I; see also Dombrowski v. Pfister, 380 U.S. 479, 486 (1965).

38.     Further, Individual-Plaintiffs have been and continue to be denied the benefit of accruing permanent residence time in the United States for the purpose of seeking naturalization – a benefit each individual Plaintiff relied upon until Defendant-DOS' action in this case.  See INA § 316; 8 U.S.C. § 1427 (setting forth comprehensive requirements for naturalization of noncitizens).

39.     Plaintiffs' injuries are concrete, as they are directly traceable to the challenged action and Defendants' unlawful interpretation and enforcement of the Act.  See INA § 101, 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. § 1101).

40.     Plaintiffs' injuries are particularized as Defendants' actions directly target and disadvantage nonimmigrant religious workers – an identifiable group of individuals and religious organizations.

41.     Plaintiffs' injuries are the direct and proximate result of Defendants' action and enforcement of said action, as the action serves to disadvantage nonimmigrant workers seeking lawful permanent residence in the United States.

## FACTUAL BACKGROUND

### A.     EXTRAORDINARY SHORTAGE OF RELIGIOUS WORKERS

42.     Plaintiffs' injuries described in this civil action directly relate to the severe shortage of religious workers in the United States and the Defendants' recent exacerbation of that shortage, despite their knowledge and awareness of the issue.  This shortage is directly related to increasing delays, specifically affecting religious workers under the Act.  See Olivia Lyons, *Immigration issue has diocese scrambling to fill priest vacancies in Vermont*, WCAX3, May 3, 2021, https://www.wcax.com/2021/05/03/immigration-issue-has-diocese-scrambling-to-fill-priest-vacancies-in-vermont/ (last viewed August 7, 2024).

43.     These delays even garnered attention by members of the United States Senate; Senators Susan Collins and Tim Kaine recently co-authored a letter calling on USCIS to address the significant delays affecting religious workers.  See *Letter from Senators Susan Collins and Tim Kaine*, U.S. Senate, Nov. 2, 2021, https://www.collins.senate.gov/sites/default/files/2021.11.02%20Collins-Kaine%20Letter%20to%20Mayorkas-Blinken%20re%20Religious%20Workers_0.pdf.     The letter details the hardships associated with these delays, including the requirement of expired R-1 nonimmigrants to leave the country, the loss of clergy for houses of worship, and the subsequent deterioration of religious services provided to American communities.  Id.

44.     It is well-documented that Roman Catholic Churches in the United States are facing substantial hardship in recruiting home-grown clergy due to decades of declining church attendance and the significant damaging effects of widespread clergy abuse scandals.  See Kwasi Gyamfi Asiedu, *US Catholic clergy shortage eased by recruits from Africa*, AP NEWS (Dec. 27, 2021).  Between 1970 and 2020, "the number of priests in the U.S. dropped by 60% [...] [t]his has left more than 3,500 parishes without a resident pastor."  Id.

45.     As of 2023, the national priest shortage problem continued to grow within Catholic communities.  See Dylan Fearon & Zoe Strothers, *Priest shortage leaves over 3,500 churches without resident priest*, WFSB (Feb. 17, 2023), https://www.wfsb.com/2023/02/18/priest-shortage-leaves-over-3500-churches-without-resident-priest/  (last viewed August 7, 2024).  Because of the national shortage, parishes are left without resident Roman Catholic Priests, meaning that current Roman Catholic Priests in active ministry have already been forced to rotate to several different churches within their community.  Id.  Such a shortage deprives Priests and their congregants alike of religious service and attention.

-14-

46.     To exemplify the gravity of the priest shortage in the United States, St. Charles Borromeo, a parish located in California, expects to serve 14,000 families per week with only three (3) full-time priests.  See Esther Quintanilla, *A shortage of Catholic priests is why the largest congregation in the U.S. is so big*, NPR (Feb. 20, 2023), https://www.npr.org/2023/02/20/1158401832/largest-catholic-parish (last viewed August 7, 2024).  In May of 2024, the Catholic Diocese of Buffalo, New York, announced its plan to close and merge dozens of Catholic Churches across eight counties.  See Eileen Buckley, *'Nobody wants it': Catholics respond to Diocese of Buffalo's plan to close churches*, WKBW (May 29, 2024), https://www.wkbw.com/news/local-news/buffalo/nobody-wants-it-catholics-respond-to-buffalo-diocese-plan-to-close-churches (last viewed August 7, 2024).  As a solution, the Catholic Church recruits Roman Catholic Priests from other parts of the world into the United States, relying on the fractured immigration system in the United States to fill the gap created by the growing shortage of home-grown priests in the United States.  Now, more than ever, the Roman Catholic Church in the United States relies upon foreign-born religious workers to serve the faithful Roman Catholic population in the United States.

47.     As it takes at least seven (7) years for a man to become a Roman Catholic Priest, the Roman Catholic church must rely on foreign-born Roman Catholic Priests to serve its faithful congregations.  See Brandon Hudson & David Komer, *Archdiocese of Detroit, and the nation faces Catholic priest shortage*, FOX 2 DETROIT (Jun. 3, 2022), https://www.fox2detroit.com/news/archdiocese-of-detroit-and-the-nation-faces-catholic-priest-shortage (last viewed August 7, 2024).  As of 2019, an estimated one (1) in six (6) Roman Catholic Priests in the United States are from other countries.  See Jean Hopfensperger, *Catholics turn to foreign priests to ease clergy shortage*, STAR TRIBUNE (Oct. 12, 2019),

https://www.startribune.com/catholics-turn-to-foreign-priests-to-ease-clergy-shortage/562922192/ (last viewed August 7, 2024).   Due to the declining number of Roman Catholic Priests, Roman Catholic Dioceses from  across the United States, including Plaintiff-1, are being forced to consolidate their parishes and potentially close places of worship if Roman Catholic Priests cannot relocate to the United States.   See Josh Kristianto, *Religious decline leading to lack of Omaha Catholic priests over next 10 years*, KETV (Mar. 5, 2023), https://www.ketv.com/article/religious-decline-leading-to-lack-of-omaha-catholic-priests-over-next-10-years/43149167 (last viewed August 7, 2024).

48.     It is evident that an ongoing and severe shortage of religious workers, particularly Priests, is plaguing the Roman Catholic Church in the United States, resulting in an increased reliance on foreign clergy.   While foreign Priests have stepped in to address the shortage, this solution is no longer viable because of Defendants' actions.   The shortage been exacerbated by delays in the employment-based visa application process for nonimmigrant religious workers, a collective concern about which the United States government is not only aware, but despite this awareness, has nonetheless insisted on the enforcement of policy which directly and adversely contributes to an increasing and collective crisis of faith in the modern world.   Despite a clear awareness of the issue, the United States government has thus far failed to take any steps to alleviate this persistent issue, leaving many parishes and their congregations in distress.

**B.    DEFENDANTS' REGULATIONS REQUIRE PETITIONS FOR EMPLOYMENT-BASED IMMIGRANTS**

49.     Defendant-USCIS relies upon regulations that specify use by non-religious employers of its Form I-140, Petition for Immigrant Worker, to classify workers pursuant to the

First, Second, and Third Employment-Based preference categories.  See 8 U.S.C. § 1153(b)(1)-(3).

50.    On the other hand, religious employers must utilize the Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, to seek nonimmigrant classification of ministers or religious workers.  See 8 U.S.C. § 1153(b)(4); see also 8 C.F.R.§ 204.5(a).

### C.    ADJUSTMENT OF STATUS GENERALLY

51.    When the Immigration and Nationality Act was first enacted in 1952, the requirements for eligibility for adjustment of status to that of a lawful permanent resident under Section 245(a) of the Act included a requirement that a visa be immediately available both at the time of filing to adjust status to lawful permanent residence and at the time of adjudication of the application to adjust status to lawful permanent residence.  See INA § 245(a); 8 U.S.C. § 1255(a).

52.    In 1960, the United States Congress amended Section 245(a) of the Act to eliminate the requirement that an immigrant visa number be available at the time of filing.  Immigration and Nationality Act, Pub. L. No. 86-648, § 10 (1960).  In 1976, the United States Congress reinstated the visa requirement, but removed the requirement that an immigrant visa be immediately available at the time of adjudication of the application.  See Immigration and Nationality Act, Pub. L. No. 94-571, § 6 (Oct. 20, 1976).

53.    In 1997, Congress again amended the statutory provisions concerning adjustment of status, recognizing that Legacy-INS delays caused employment-based applicants to lose employment, by allowing certain employment-based visa applicants to adjust status to that of lawful permanent residence pursuant to Section 245(a) of the Act if they have not exceeded an aggregate period of 180 days of unlawful presence.  See PL. 105-119, TITLE L § 111, 111 STAT. 2440, 2458-59 (NOV. 26, 1997).

54.     Section 245(k) of the Act applies to religious workers subject to the EB-4 preference category as well as non-religious workers subject to the EB-1, EB-2, and EB-3 preference categories.  INA § 245(k); 8 U.S.C. § 1255(k).  However, by its terms, no protections exist for applicants, including Individual-Plaintiffs, who exceed 180 days without lawful status or who work without authorization beyond 180 days.  Id.

55.     Section 245(a) of the Act permits the Attorney General to adjust the status of certain nonimmigrants to lawful permanent resident status in the United States.  INA § 245(a); 8 U.S.C. § 1255(a).  Specifically, the Attorney General may adjust a non-immigrant to permanent resident status if: "(1) the [non-immigrant] makes an application for such adjustment, (2) the [non-immigrant] is eligible to receive an immigrant visa and is admissible to the United States for permanent residence[;] and (3) an immigrant visa is immediately available to him at the time [the non-immigrant's] application is filed."  Id.

56.     The Act does not specify when a visa is immediately available or when the applicant or petitioner may make an application, but the applicable regulations dictate that this occurs when the Visa Bulletin reflects that a visa is available.  See 8 C.F.R. § 245.1(g)(1) ("A preference immigrant visa is considered available for accepting and processing if the applicant has a priority date on the waiting list that is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current").

57.     This is not the case for religious workers.  Special immigrant religious workers must first file the Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, with Defendant-USCIS, and receive approval of the Petition from Defendant-USCIS prior to a religious worker becoming eligible to apply for lawful permanent residence through the filing of a Form I-485,     Application     to     Register     Permanent     Residence     or     Adjust     Status.

See 8 C.F.R. §245.2(a)(2)(i)(B).  Defendants' permit classes of noncitizen[1] workers to concurrently petition for a visa and a Form I-485, Application to Register Permanent Residence or Adjust Status.  Id.

58.  Upon applying for adjustment of status, a noncitizen becomes eligible for the issuance of an employment authorization document as well as advance parole, which permits international travel while the underlying application to adjust status to lawful permanent residence is pending.  See INA § 212(d)(5)(A); 8 C.F.R. § 274a.12(c)(9).  The adjustment of status application, which is submitted pursuant to Section 245(a) of the Act, also protects against the accrual of unlawful presence for the period that the application is pending.  See INA § 212(a)(9)(B); 8 U.S.C. § 1182(a)(9)(B).  When an application to adjust status to lawful permanent residence is submitted, an immigrant visa must be "immediately available" or Defendant-USCIS will reject the application.  See 8 U.S.C. § 1245(a); 8 C.F.R. § 245.2(a).

### D.  PROVISIONS FOR RELIGIOUS WORKERS

59.  Eligible noncitizens may be admitted to the United States as temporary, nonimmigrant religious workers pursuant to the R-1 nonimmigrant visa category.  See 8 U.S.C. § 214.1.

60.  Under the Act, up to 5,000 special immigrant visas may be granted to religious workers each year.  INA §§ 203(b)(4), 101(a)(27)(C); 8 U.S.C. §§ 1153(b)(4), 1101(a)(27)(C).  Visa applicants under this category may be living overseas, or many others are already present in the United States under the R-1 nonimmigrant classification.  See INA § 101(a)(15)(R); 8 U.S.C.

---

[1] Please note this Complaint respectfully utilizes the term "noncitizen" as equivalent to the statutory term "alien."  See 8 U.S.C. § 1101(a)(3); see also Barton v. Barr, 590 U.S. 222 n.3 (2020).

§ 1101(a)(15)(R).  Religious workers under the R-1 nonimmigrant classification may stay in the United States for up to five years, subject to limited exceptions.  <u>Id</u>.  Accordingly, R-1 nonimmigrants must generally depart the United States after five years unless they seek to "adjust status" to that of a lawful permanent resident prior to their R–1 visa's expiration.  <u>Id</u>.

61.      If the nonimmigrant fails to adjust status or depart the country, their status will be unlawful.  <u>See</u> INA § 245(c), (k); 8 U.S.C. § 1255(c), (k).  Further, if the noncitizen accrues a period of unlawful presence of more than 180 days, the noncitizen is statutorily ineligible for adjustment of status.  <u>Id</u>. § 245(k); § 1255(k).

## E.      VISA ALLOCATION GENERALLY

62.      The Department of State is responsible for allocating immigrant visas within the limits set by Congress.  <u>See</u> 22 C.F.R. § 42.51.  Congress has provided for the DOS to "make reasonable estimates of the anticipated number of visas to be issued during any quarter of any fiscal year . . . and to rely upon such estimates in authorizing the issuances of visas."  <u>See</u> INA § 203(g); 8 U.S.C. § 1153(g).

63.      The Act limits the number of immigrant visas available each fiscal year and allocates immigrant visas in three broad categories.  The three district categories are: (i) family-based; (ii) employment-based; and (iii) diversity (allocated by a lottery system).  <u>See</u> INA §§ 201-202; 8 U.S.C. §§ 1151-52.

64.      The overall numerical limit for permanent employment-based immigrants is 140,000 per year.  <u>See</u> INA § 201(d); 8 U.S.C. § 1151(d); <u>see also</u> U.S. Department of State, "Employment-Based          Immigrant          Visa,"          available          at https://travel.state.gov/content/visas/en/immigrate/employment.html (last accessed August 7, 2024).  This total number includes the immigrants in addition to their eligible spouses and minor

unmarried children, and therefore, the actual number of employment-based immigrants is less than 140,000 each year.  Id.  Any unused family preference immigrant numbers from the preceding year are added to this cap to establish the number of visas available for allocation through the employment-based system.  Id.

65.     Section 202 of the Act restricts family-based and employment-based visas available to nationals of any one foreign nation to seven percent "of the total number of such [immigrant] visas made available . . .  in that fiscal year."  INA § 202(a)(2); 8 U.S.C. § 1152(a)(2).  Within the employment-based category, visa allotments are further broken down into five preference categories.  Id. at §§ 203(b); 1153(b).  The fourth preference category (the "EB-4" category) consists of a special sub-category of immigrants delineated in the Act to include certain religious workers, certain current and former United States Government employees abroad, certain officers and employees of international organizations, and Special Immigrant Juveniles.  See INA §§ 101(a)(27), 203(b)(4); 8 U.S.C. § 1101(a)(27), 1153(b)(4).  Specifically, Section 101(a)(27)(C) of the Act defines an "special immigrant" for purposes of the EB-4 Category as:

> an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who-
>
> > (i)     for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;
> >
> > (ii)    seeks to enter the United States-
> >
> > > (I)     solely for the purpose of carrying on the vocation of a minister of that religious denomination,
> > >
> > > (II)    before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or
> > >
> > > (III)   before September 30, 2015, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt

> from taxation as an organization described in sectiI501(c)(3) of title 26) at the request of the organization in a religious vocation or occupation; and
>
> (iii)   has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i) [of this section][.]

INA § 101(a)(27)(C)(i)-(iii); 8 U.S.C. § 1101(a)(27)(C)(i)-(iii).

66.      Eligible noncitizens may be admitted to the United States as temporary, nonimmigrant religious workers pursuant to the R-1 nonimmigrant visa category. <u>See</u> 8 C.F.R. § 214.2(r)(4). The statutory maximum period of stay for R-1 nonimmigrants is 60 months, or five years. <u>See</u> 8 C.F.R. §§ 214.2(r)(5)-(6); <u>see also</u> INA § 101(I15)(R).

67.      The Act enables an immigrant to obtain a visa as a "special immigrant religious worker" if the intending immigrant meets certain statutory criteria. To become a legal permanent resident through the special immigrant religious worker program, a noncitizen or their prospective religious employer must complete two steps. First, the religious employer must successfully petition Defendant-USCIS for an immigrant visa with the filing of a Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant. <u>See</u> 8 C.F.R. §§ 1204.5(a), (c), (m)(6). If that Petition is approved, the special immigrant religious worker may file with Defendant-USCIS a Form I-485, Application to Register Permanent Residence or Adjust Status. <u>See</u> INA § 245(a); 8 U.S.C. § 1255.

68.      Upon applying for adjustment of status, a noncitizen becomes eligible for the issuance of an employment authorization document as well as advance parole, which permits international travel while the underlying application to adjust status to lawful permanent residence is pending. <u>See</u> 8 C.F.R. § 274a.12I(9); <u>see</u> <u>also</u> INA § 212(d)(5)(A); 8 U.S.C. § 1182(d)(5)(A). The adjustment of status application, which is submitted pursuant to Section 245(a) of the Act,

also protects against the accrual of unlawful presence for the period that the application is pending. See INA §§ 245(a), 212(a)(9)(B); 8 U.S.C. §§ 1182(a)(9)(B), 1255(a).

69.     As noted, Defendant-USCIS defines a visa as "available" for "accepting and processing" the adjustment of status application through a review of a monthly "Visa Bulletin" that Defendant-DOS releases.  The Visa Bulletin states that the preference category is current or if the noncitizen's priority date is earlier than the date shown in the Visa Bulletin.  See 8 C.F.R. § 245.1(g)(1).  Immediately prior to approval of an adjustment application, a USCIS officer must request that a visa number be allocated by Defendant-DOS.  See 8 C.F.R. § 245.2(a)(5)(ii).  Such a request is not to be made until after the applicant has been interviewed and found to be eligible for adjustment of status.  Id.  Where no interview is required, the applicant still must have been found to be eligible for adjustment of status before a number can be ordered.

70.     The approval of a noncitizen as a religious worker under the Act does not alone result in immediate receipt of a visa; rather, it only allows the noncitizen immigrant to get a place in line for the issuance of a visa at a later date.  The approved petition is placed in a queue with others in the same category in order of "priority date," that is, the date a petition was filed with USCIS.  See INA § 203(e)(1); 8 U.S.C. § 1153(e)(1); 8 C.F.R. § 204.1(b); 22 C.F.R. 42.53(a). Each month, Defendant-DOS sets a cut-off date for each preference category, including the EB-4 preference category, indicating that visas are immediately available for beneficiaries with priority dates earlier than the posted "priority date."  See 8 C.F.R. § 245.1(g)(1); 22 C.F.R. § 42.51(b). The system is thus first-come, first-served within each preference category, with visas becoming available in order of priority date.  Id.

   F.     **ALLOCATION AND ISSUANCE OF IMMIGRANT VISAS BY THE DEFENDANT-DOS.**

71.     The Department of State is responsible for allocating immigrant visas within the limits set by Congress.  <u>See</u> 22 C.F.R. § 42.51.  Congress has provided for the DOS to "make reasonable estimates of the anticipated number of visas to be issued during any quarter of any fiscal year ... and to rely upon such estimates in authorizing the issuances of visas."  <u>See</u> INA § 203(g); 8 U.S.C. § 1153(g).  The overall numerical limit for permanent employment-based immigrants is 140,000 per year.  <u>See</u> INA § 201(d); 8 U.S.C. § 1151(d); <u>see also</u> U.S. Department of State, "Employment-Based Immigrant Visa," last accessed October 15, 2023, https://travel.state.gov/content/visas/en/immigrate/employment.html.  This total number includes the immigrants in addition to their eligible spouses and minor unmarried children, and therefore, the actual number of employment-based immigrants is less than 140,000 each year.  <u>Id</u>.  Any unused family preference immigrant numbers from the preceding year are added to this cap to establish the number of visas that are available for allocation through the employment-based system.  <u>Id</u>.

72.     Each month Defendant-DOS publishes a Visa Bulletin, which announces visa availability in each preference category for the following month.  <u>See</u> U.S. Citizenship and Immigration Services, *Green Card*, *Visa Retrogression*, https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression  (last accessed Aug. 7, 2024).  The Visa Bulletin further informs the public whether visas are available without limit in a particular category, whether they are unavailable, or whether they are available only for foreign employees with a priority date before a certain date (known as the "cut-off" date).  <u>Id</u>.  While Defendant-DOS relies on the Act to establish prohibitions against and allocation of visa availability, Defendant-DOS utilizes internal procedures to perform visa calculations.

-24-

73.     When demand for immigrant visas in a particular category exceeds the number of immigrant visas available, Defendant-DOS considers the category "oversubscribed" and imposes a "final action date."  See U.S. Citizenship and Immigration Services, Green Card, Visa Retrogression, https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression (last accessed Mar. 14, 2024); see also Mehta v. United States Dep't of State, 186 F. Supp. 3d 1146, 1150 (W.D. Wash. 2016).  Then, only applicants for adjustment of status with priority dates before the "final action date" are considered to have visa numbers available and, as a result, may file an application to adjust status to lawful permanent residence.  INA § 203(g); 8 U.S.C. § 1153(g).

74.     This action challenges, inter alia, Defendant-DOS' sudden change of interpretation of the Act that took place in March of 2023, and Defendant-DOS' subsequent calculation based on that interpretation.

G.     **VISA BULLETIN HISTORY**

75.     Defendant-DOS, by and through the Bureau of Consular Affairs, a sub-agency under the direction and control of Defendant-DOS, made the following public announcement concerning the May of 2016 Visa Bulletin:

> **OVERSUBSCRIPTION OF THE EL SALVADOR, GUATEMALA, AND HONDURAS EMPLOYMENT-BASED FOURTH (E4) AND CERTAIN RELIGIOUS WORKERS (SR) PREFERENCE CATEGORIES**
>
> There is currently extremely high demand in the E4 and SR categories for applicants from El Salvador, Guatemala, and Honduras. This demand is primarily for Juvenile Court Dependent cases filed with U.S. Citizenship and Immigration Services for adjustment of status. Pursuant to the Immigration and Nationality Act, this requires implementing E4 and SR Application Final Action Dates for these countries, which will allow the Department to hold worldwide number use within the maximum allowed under the FY-

2016 annual limits. Any forward movement during the remainder of FY-2016 is unlikely; although no specific prediction is possible.

A determination as to whether these countries will remain subject to E4 and SR final application dates under the FY-2017 annual numerical limitation will be made in early September. Future visa availability will depend on a combination of demand for numbers being reported each month, and the extent to which otherwise unused numbers become available.

It is extremely likely that the India and Mexico Employment Fourth Preference categories will also become oversubscribed at some point during the summer months.

See Exhibit A, Defendant-DOS State Visa Bulletin, Vol. IX, No. 92 (May 2016).   This

announcement coincided with Defendant-DOS delineating visa availability for these countries

separately from the rest of the world, calculating visa availability for EB-4 category from El

Salvador, Guatemala, and Honduras separately and severing El Salvador, Guatemala, and

Honduras, then referred to the "Northern Central American Countries" or the "NCA Countries"

from the rest of the world.

76.     The Visa Bulletin issued by Defendant-DOS in July of 2016 readdressed the

announcement made in May of that year:

**VISA AVAILABILITY FOR THOSE COUNTRIES WHICH ARE, OR WILL BE, SUBJECT TO A FINAL ACTION DATE IN THE EMPLOYMENT-BASED FOURTH (E4) AND CERTAIN RELIGIOUS WORKERS (SR) PREFERENCE CATEGORIES**

INA Section 202 sets an annual per-country limitation for preference immigrants of 7 percent of the worldwide level, to avoid monopolization of the annual limit by applicants from only a few countries.

INA Section 202(a)(5)(A) provides that if total demand will be insufficient to use all available numbers in an Employment preference during a calendar quarter, then the otherwise unused numbers may be made available in that preference without regard to

the per-country limits. This provision helps to assure that all available Employment preference numbers may be used. Through late winter, this provision allowed countries with demand in excess of their normal per-country limit to utilize numbers that would have otherwise gone unused. Those countries were El Salvador, Guatemala, and Honduras.

By April, the level of worldwide Employment Fourth preference demand had increased to the point where there was sufficient demand to fully utilize the FY-2016 worldwide preference limit. It therefore became necessary to impose a final action date on those countries which had already reached their per-country limit, followed by those which would reach their limit in the coming months.

Readers should be aware that the establishment of the Employment Fourth preference Final Action date of January 1, 2010 does not mean that applicants are now subject to a wait in excess of six years. That Final Action Date is intended only to stop any further use of numbers by applicants from those countries under the FY-2016 annual limit, not to indicate how long it will be before applicants will be eligible for final action.

See Exhibit A, Defendant-DOS Visa Bulletin, Vol. IX, No. 93 (June 2016).

77.     The separation of El Salvador, Guatemala, and Honduras was again reflected in the October 2017 Visa Bulletin, which reflected the following chart for employment-based visa priority dates:

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 15FEB12 | C | 15JAN07 | C | C |
| 3rd | 01JUN16 | 22JAN13 | 01JUN16 | 01MAR05 | 01JUN16 | 01DEC10 |
| Other Workers | 01JUN16 | 01JAN05 | 01JUN16 | 01MAR05 | 01JUN16 | 01DEC10 |
| 4th | C | C | 15JUN15 | C | C | C |
| Certain Religious Workers | U | U | U | U | U | U |

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 5th Non-Regional Center (C5 and T5) | C | 22FEB14 | C | C | C | C |
| 5th Regional Center (I5 and R5) | U | U | U | U | U | U |

See Exhibit A, Defendant-DOS Visa Bulletin, Vol. IX, No. 97 (October 2016).  Over the course of many years, it remained DOS policy and practice to separate El Salvador, Guatemala, and Honduras in the calculation of visa availability as it related to the EB-4 preference category.

78.      This practice, described supra, continued for years.  See generally Exhibit A.

79.      Defendant-DOS issued the March of 2023 Visa Bulletin, which, again, reflected the separation of El Salvador, Guatemala, and Honduras for calculation of final action dates for EB-4 preference category calculations and visa allocations:

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | 01FEB22 | C | 01FEB22 | C | C |
| 2nd | 01NOV22 | 08JUN19 | 01NOV22 | 08OCT11 | 01NOV22 | 01NOV22 |
| 3rd | C | 01AUG18 | C | 15JUN12 | C | C |
| Other Workers | 01JAN20 | 01JUL14 | 01JAN20 | 15JUN12 | 01JAN20 | 01JAN20 |
| 4th | 01FEB22 | 01FEB22 | 15MAR18 | 01MAR21 | 01AUG20 | 01FEB22 |
| Certain Religious Workers | 01FEB22 | 01FEB22 | 15MAR18 | 01MAR21 | 01AUG20 | 01FEB22 |
| 5th Unreserved (including C5, T5, I5, R5) | C | 08JUL15 | C | 01JUN18 | C | C |

-28-

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 5th Set Aside: Rural (20%) | C | C | C | C | C | C |
| 5th Set Aside: High Unemployment (10%) | C | C | C | C | C | C |
| 5th Set Aside: Infrastructure (2%) | C | C | C | C | C | C |

See Exhibit A, Defendant-DOS Visa Bulletin, Vol. X, No. 74 (February 2023).

80. In the April of 2023 Visa Bulletin, the separate classification of El Salvador, Guatemala, and Honduras suddenly ceased, and thereafter incorporated into the EB-4 category generally, resulting in significant retrogression of visa availability for EB-4 category applicants not from El Salvador, Guatemala, and Honduras:

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|
| 1st | C | 01JUN22 | 01JUN22 | C | C |
| 2nd | 01DEC22 | 08JUL19 | 01MAY12 | 01DEC22 | 01DEC22 |
| 3rd | C | 01FEB19 | 01AUG12 | C | C |
| Other Workers | 01FEB20 | 01NOV15 | 01AUG12 | 01FEB20 | 01FEB20 |
| 4th | 01OCT18 | 01OCT18 | 01OCT18 | 01OCT18 | 01OCT18 |
| Certain Religious Workers | 01OCT18 | 01OCT18 | 01OCT18 | 01OCT18 | 01OCT18 |
| 5th Unreserved (including C5, T5, I5, R5) | C | 01JAN16 | 08DEC19 | C | C |

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|
| 5th Set–Aside: (Rural – 20%) | C | C | C | C | C |
| 5th Set Aside: (High Unemployment – 10%) | C | C | C | C | C |
| 5th Set Aside: (Infrastructure - 2%) | C | C | C | C | C |

See Ex. A, Defendant-DOS Visa Bulletin, Vol. X, No. 76 (April 2023).

### H.   MARCH 2023 RULE CONCERNING REINTERPRETATION OF THE ACT

81.   In March of 2023, Defendant-DOS sought to clarify its calculation of visa availability pursuant to the Act.   See 8 U.S.C. § 1152(a)(2); see also 88 Fed. Reg. 18252. Defendant-DOS announced it was no longer assigning separate final action and filing dates for individuals chargeable to any of the NCA Countries in the EB-4 category, and individuals chargeable to these three countries were subject to the dates in the column headed "All Chargeability Areas Except Those Listed" (referred to herein as "ROW," meaning the rest of the world).   See 88 Fed. Reg. 18252.

82.   Defendant-DOS, through this announcement, stated that it was "required to make this change to bring Department practice, as reflected in the Visa Bulletin, into compliance with these INA provisions."   See 88 Fed. Reg. 18252.   Using this reasoning, the Defendant-DOS explained, "[t]here is no longer a need for a separate column for the NCA Countries in the

employment-based preference 'Final Action Dates' and 'Dates for Filing' charts in the Visa Bulletin." Id.  In support of this, the announcement provided the following information:

> Specifically, INA § 202(a), 8 U.S.C. 1152(a), makes clear that the per-country limit, which is implemented by setting final action dates for a country in the Visa Bulletin, is triggered only when preference immigrant visa demand from a country will exceed seven percent of the total number of preference visas made available in INA section 203(a)-(b), 8 U.S.C. 1153(a)-(b); that is, seven percent of the total number available for all family-sponsored and employment-based preference immigrant visas available worldwide.

Id.

83.    Referring to the prior interpretation of the applicable sections of the Act as a "misapplication of the law," Defendant-DOS' announcement went on to note that the error involved the inclusion of a separate column to the "Final Action Dates for Employment-Based Preference Cases" table, showing that EB-4 category applicants chargeable to the El Salvador, Guatemala, and Honduras were assigned an EB-4 category "Final Action Date" separate from the ROW column and El Salvador, Guatemala, and Honduras were listed as "oversubscribed" and subject to the pro-rating provision at Section 1152(e)(2) of Title 8, United States Code. See 88 Fed. Reg. 18252.  Attempting to explain, Defendant-DOS noted its prior interpretation of the law

> contravenes the [Defendant-DOS's] current interpretation of the statutory prerequisite for when a country can be deemed oversubscribed and allocation of preference visas can be pro-rated: that the INA provision on pro-rating is based on a country's demand for more than seven percent of all preference visas, not one subcategory.

88 Fed. Reg. 18252 (emphasis in original).  Accordingly, Defendant-DOS concluded, without notice or any comment period, that as "none of the NCA Countries are expected to exceed the per-country limit under 8 U.S.C. 1152(a)(2), there is no basis under the INA to set final action dates

and dates for filing for employment-based preference visas that are specific to those countries." Id.

84.     Defendant-DOS promulgated 88 Fed. Reg. 18252 on March 27, 2023, at 8:45AM, with a publish date of March 28, 2023.  88 Fed. Reg. 18252.  As noted supra, the implementation of this 88 Fed. Reg. 18252 is reflected in the April of 2023 Visa Bulletin, which became effective for enforcement on May 1, 2023.

85.     This sudden and abrupt agency action deviated from years-long practice and has profound repercussions for, inter alia, nonimmigrant religious workers in the United States and religious organizations in the United States, including Plaintiffs.

86.     In adopting 88 Fed. Reg. 18252, Defendants misinterpreted the law, failed to provide sufficient public notice of Defendants' change in policy, failed to follow proper rule making procedures, failed to allow for comments to the proposed change, and continue to enforce an incorrectly interpreted law upon countless nonimmigrant religious workers who detrimentally relied upon a years-long pattern and practice of separating NCA countries from the calculation of visa availability for the EB-4 category.

87.     As of July of 2024, the current delays for EB-4 nonimmigrants are now 3 years, 6 months, and 18 days.  See Ex. A, U.S. Dep't of State Visa Bulletin, Vol. X, No. 91 (July 2024). Accordingly, countless nonimmigrant religious workers in the United States, including Plaintiffs, who await permanent residence, now face two equally dire options imposed upon them by Defendant-DOS: violate their nonimmigrant status or abandon their congregations.  See 88 Fed. Reg. 18252 (an evident misrepresentation of the Act imposing such restrictions on nonimmigrants subject to the EB-4 preference category).  As demonstrated below, in adopting 88 Fed. Reg. 18252 and enforcing a discriminatory scheme that harms religious workers and employers, Defendants

violated the Administrative Procedures Act, violated the Religious Freedom Restoration Act, violated the Congressional Review Act, and infringed upon Plaintiffs' protected constitutional rights.  This action prays for urgent recourse on behalf of the countless Roman Catholics in the United States.

## CAUSES OF ACTION

## COUNT I

## ALL PLAINTIFFS v. DEFENDANT-DOS
## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

88.     Plaintiffs incorporate Paragraphs 1 to 87 as set forth in full herein.

89.     This action concerns the "black box" of unknowns that are Defendant-DOS' procedures as to the calculation of visa availability consistent with the Act.  See Meina Xie v. Kerry, 780 F.3d 405, 407 (D.C. Cir. 2015).

90.     The Administrative Procedure Act requires an agency, before publishing a final rule, to (1) put a notice of proposed rulemaking in the Federal Register, (2) accept comments on that proposal, and (3) consider those comments.  See 5 U.S.C. § 553(b)–(c); see also Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs., 58 F.4th 696, 706 (3d Cir. 2023), judgment entered, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023).

91.     An agency must promulgate a binding final rule through the publication of an official Notice of Public Rulemaking in the Federal Register that includes "the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).

92.     Here, the rule at issue is plainly a substantive rule and not an interpretive rule.  The DOS rule published to the Federal Register on March 28, 2023, announced a sudden and substantial change to Defendant-DOS' well-established policy and interpretation of a critical

portion of the Act that directly impacts the legal rights of countless individuals, including Plaintiffs, who selflessly devote their lives to the religious service of their community.  See 88 Fed. Reg. 18252.

93.    The statute Defendant-DOS sought to interpret read as follows:

> Subject to paragraphs (3), (4), and (5), the total number of immigrant visas made available to natives of any single foreign state or dependent area under subsections (a) and (b) of section 1153 of this title in any fiscal year may not exceed 7 percent (in the case of a single foreign state) or 2 percent (in the case of a dependent area) of the total number of such visas made available under such subsections in that fiscal year.

See INA § 202; 8 U.S.C. § 1152.  Defendant-DOS has failed in its effort to interpret this statute and relies upon methodology not easily derivable from the statute to the direct detriment of Plaintiffs.  Certainly, this rule did not "merely clarify or explain existing law or regulations." Southern California Edison Co. v. Federal Energy Regulatory Comm'n, 770 F.2d 779, 783 (9th Cir.1985); see also Hoctor v. U.S. Dep't of Agric., 82 F.3d 165, 170 (7th Cir. 1996) (holding that for a rule to be interpretive in nature, it must be "derived from the regulation by a process reasonably described as an interpretation.").  Rather, the agency action at issue here introduced a significant and wide-ranging shift and reinterpretation of law that directly impacts the legal rights and privileges of some of the countries' most well-respected noncitizens and religious organizations alike.

94.    Without sufficient notice of this substantive rule, the public was denied the ability to provide input and commentary on a change that will affect the public interest.  To interpret this rule as an interpretive rule would run counter to the legislative intent of the APA and its rulemaking provisions.  See Council Tree Commc'ns, Inc. v. F.C.C., 619 F.3d 235, 250 (3d Cir. 2010) (quoting

Int'l Union, United Mine Workers v. Mine Safety & Health Admin., 407 F.3d 1250, 1259-60 (D.C. Cir. 2005).

95.     The unlawful determinations of Defendant-DOS in implementing a substantive change of the Act's interpretation through the March 2023 Defendant-DOS Rule was incorrect and a misreading of the Act, thus triggering analysis pursuant to Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984).[2]

96.     When adopting a policy without notice and comment that became effective May 1, 2023, Defendant-DOS arbitrarily, capriciously, and without providing an opportunity for public notice and comment changed the established procedures for determining the calculation of visa availability for the EB-4 category in a manner that has had, and continues to have, a severe adverse impact on Individual-Plaintiffs and their ability to continue their selfless religious service in the United States.

97.     As the effect of Defendant-DOS's misinterpretation fails to convey a plain, unambiguous, and reasonable meaning as to the calculation of visa availability, the March 2023 Defendant-DOS Rule is outside Defendant-DOS's statutory authority under the Act.  See Loper Bright Enterprises, 144 S. Ct. 2244, 2270-73 (2024).

98.     Defendant-DOS's promulgation and implementation of the March 2023 Defendant-DOS Rule lacked any relevant and compelling evidence or facts sufficient to determine whether the action of Defendant-DOS would affect the statutory and constitutional rights of individuals subject to the EB-4 immigrant preference category.  See Loper Bright Enterprises, 144 S. Ct. 2244,

---

[2] The U.S. Supreme Court's decision in Loper Bright Enterprises, overruled the Chevron doctrine. 144 S. Ct. 2244 (2024).  Courts must now exercise independent judgment to determine if an agency has acted within its statutory authority, considering but not deferring to the agency's interpretation of the law, even when a statute is ambiguous. Id. at 2270-73.

2270-73 (2024).

99.     When adopting a policy without notice and comment that became effective May 1, 2023, Defendants retroactively imposed new rules, policies, and practices as expressed in the purported update to the March of 2023 Visa Bulletin, and all subsequent Visa Bulletins. Defendants' retroactive application of these new rules, policies, and practices, even if regarded as interpretive, must not be applied retroactively to Plaintiffs' detriment.

100.     The retroactive application of Defendant-DOS' agency action irreparably harms and impermissibly burdens Plaintiffs, as Plaintiffs have detrimentally relied on Defendant-DOS' longstanding prior guidance and policy to ascertain when Individual-Plaintiffs would be eligible to file applications to adjust status to lawful permanent residence.  Plaintiffs rushed to obtain the necessary supporting documentation and undertook extraordinary and costly steps to assemble the required information to file adjustment of status applications.  The new rules, policies, and practices, even if regarded as interpretations, represent an abrupt departure from well-established policy and practice.  Likewise, the application of this agency action irreparably harms Plaintiff-1, a religious institution facing a well-documented shortage of religious workers which now faces imminent, countless congregations facing abandonment by their assigned Priest.

101.     Plaintiffs relied on the former rules, policies, and/or practices of Defendant-DOS with respect to use of the Visa Bulletin to determine eligibility to apply for adjustment of status to lawful permanent residence, specifically on the representations made in the Visa Bulletins between from May of 2016 through March of 2023 regarding immigrant visa availability.

102.     The retroactive application of the new rules, policies, and/or practices, even if regarded as interpretations, placed and continue to place extreme burdens on Individual-Plaintiffs as all would have been entitled to apply to adjust status to lawful permanent residence far sooner

than permissible under the unlawful policy now in place, and thus, also would have been entitled to interim benefits, such as advance parole and employment authorization documents but for Defendant-DOS' unlawful policy change and Defendant-USCIS' refusal to accept Individual-Plaintiffs' applications to adjust status to lawful permanent residence for processing.  As described supra, Defendant-USCIS is statutorily required to depend upon the accuracy of Defendant-DOS' Visa Bulletin in making its determinations for who is and who is not able to file applications to adjust status to lawful permanent residence.

103.    The statutory interest in applying these new rules, policies, and/or practices to Plaintiffs and individual Plaintiffs' applications for immigrant benefits and ongoing ability to engage in their religious practices and assist their community does not outweigh Plaintiffs' reliance on Defendants' longstanding interpretation of the applicable law for visa allocation as reflected in nearly seven years of DOS policy and practice.

104.    Likewise, the statutory interest in applying the March 2023 Defendant-DOS Rule to Plaintiff-1 does not outweigh Plaintiff-1's reliance upon Defendant-DOS' longstanding interpretation of the law.

105.    As a result of the retroactive application of new rules, policies and/or practices, even if characterized as interpretations, Plaintiffs now suffer extreme burden and have been and will continue to be irreparably injured to their detriment.

106.    Further, the discriminatory regulation set forth at 8 C.F.R. § 245.2(a)(2)(i)(B) violates Section 1255(a) of the United States Code, which requires that one may apply to adjust status when a visa is available, by improperly imposing additional requirements upon religious employers, while non-religious employers may seek concurrent filing for adjustment of status for their employees.

107.     The USCIS's interpretation of who is eligible to apply for adjustment of status is arbitrary, capricious, and not substantially supported by law, and the Court may vacate the policy and its effects.  5 U.S.C. §§ 704-706.

108.     The refusal of Defendant-USCIS to extend premium processing to immigrant visa petitions for religious workers while extending that benefit to all other employment-based petitions is outside its statutory authority under the Act and arbitrary and capricious.

## COUNT II

### ALL PLAINTIFFS v. ALL DEFENDANTS
### VIOLATION OF THE CONGRESSIONAL REVIEW ACT

109.     Plaintiffs incorporate Paragraphs 1 to 108 as set forth in full herein.

110.     The Congressional Review Act, Pub. L. No. 104–121, § 251, 110 Stat. 847, 868, which incorporates in its entirety the APA, provides that a final rule may not be deemed effective until the passage of at least sixty days from the date of publication in the Federal Register or receipt of the rule by the United States Congress.  5 U.S.C. § 801(a)(3)(A).  The March 2023 Defendant-DOS Rule was published in the Federal Register on March 28, 2023.  88 Fed. Reg. 18252.  The March 2023 Defendant-DOS Rule was effective as of May 1, 2023.

111.     Thirty-nine days passed between the date of publication in the Federal Register of the March 2023 Defendant-DOS Rule and the May 1, 2023, effective date of the March 2023 Defendant-DOS Rule, which is less than the necessary sixty days and thus runs afoul of the Congressional Review Act, Pub. L. No. 104–121, § 251, 110 Stat. 847, 868.

112.     Defendant-DOS failed to provide for proper notice and comment as to the March 2023 Defendant-DOS Rule and its sudden reinterpretation of the Act as it relates to the calculation

of visa availability to, inter alia, individuals subject to the EB-4 nonimmigrant preference category, including Individual-Plaintiffs.

113.    Defendant-DOS' failure to observe the procedures set forth by federal law necessitates the Court's nullification of the March 2023 Defendant-DOS Rule. 5 U.S.C. § 706(2)(D); Congressional Review Act, Pub. L. No. 104–121, § 251, 110 Stat. 847, 868.

## COUNT III

## ALL PLAINTIFFS v. ALL DEFENDANTS
## VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

114.    Plaintiffs incorporate Paragraphs 1 to 113 as set forth in full herein.

115.    The Religious Freedom Restoration Act ("RFRA") provides that the United States Government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "the application of the burden to the person— (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb–1(a) to 1(b); Holt v. Hobbs, 574 U.S. 352, 357 (2015). The "RFRA was designed to provide very broad protection for religious liberty" and it reaches "far beyond what [. . .] is constitutionally required" by the First Amendment. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 706 (2014). The RFRA applies to "all [f]ederal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after the enactment of [RFRA]," except for federal statutes "adopted after [the enactment of RFRA]" which "explicitly exclude[]such application by reference to RFRA." 42 USCS § 2000bb-3.

116.    The applicable sections of the Act predate the enactment of the RFRA and, therefore, the RFRA and its protections apply to religious violations committed by Agencies of

-39-

the United States Government and as implemented through the enforcement procedures set forth under the Act.  Defendants have failed to utilize the least restrictive means possible to implement the Act, which results in a direct threat to the ability of Plaintiffs to freely practice Plaintiffs' religion.

117.    A substantial burden on free exercise of religion impacts Individual-Plaintiffs, who are all Roman Catholic Priests, and now face imminent departure from the United States following years of justifiable reliance upon Defendant-DOS' traditional policy and practice, which will cause severe and substantial disruption to the lives and religious freedoms of Individual-Plaintiffs and hundreds of thousands of Roman Catholic United States Citizens and Lawful Permanent Residents throughout the State of New Jersey.

118.    Defendants' enforcement of the March 2023 Defendant-DOS Rule is contrary to policy, statute, and the core religious freedoms the United States Congress sought to protect at the time of the RFRA's enactment.

119.    Defendants' enforcement of the March 2023 Defendant-DOS Rule now imposes and will continue to impose a substantial burden on Plaintiffs' free exercise of religion without using the least restrictive means to further an unknown and unspecified government interest in violation of the RFRA.

120.     The withholding of benefits provided to other employers, such as concurrent filing and premium processing, places a substantial burden on the Plaintiff-1's religious exercise and serves no compelling government interest, nor is this the least restrictive means of carrying out the policies of the immigration laws in violation of the RFRA.

**COUNT IV**

**ALL PLAINTIFFS v. ALL DEFENDANTS**

### VIOLATION OF THE FREE EXERCISE CLAUSE
### OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

121.    Plaintiffs incorporate Paragraphs 1 to 120 as set forth in full herein.

122.    The First Amendment of the United States Constitution provides that the federal government "shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U. S. CONST. amend. I.

123.    Defendants' misinterpretation of the Act to implement methods and/or manners of the calculation of visa availability, insofar as the same (1) creates substantial retrogression of visa availability for individuals subject to the EB-4 immigrant preference category, (2) enforces a misinterpretation of the law to unreasonably delay the issuance of immigration benefits to individuals subject to the EB-4 immigrant preference category, (3) uniquely harms nonimmigrant religious workers and religious organization that rely on statutorily limited periods of stay pursuant to the R-1, nonimmigrant visa classification, (4) necessarily results in the inability of said nonimmigrant religious workers' ability to continue to engage in their religious vocation and free exercise of religion in the United States, (5) adversely impacts the hundreds of thousands of United State Citizen and Lawful Permanent Resident Roman Catholics throughout the State of New Jersey that Plaintiffs serve, (6) imposes significant distress, psychological harm, and financial burden on said nonimmigrant religious workers, (7) prohibits certain nonimmigrant religious workers from the ability to renew and/or extend lawful status in the United States, (8) prohibits nonimmigrant religious workers from applying for certain immigration benefits, including immigration benefits afforded under the Act, and (9) threatens to deprive Plaintiffs of the right to the free exercise of religion and establishment of religion as the First Amendment of the United States Constitution protects through Defendants' discrimination against Plaintiffs on account of Plaintiffs' religious

beliefs and the substantial burdening of Plaintiffs' Constitutionally protected  right to freely exercise the Roman Catholic religious faith.

124.    Defendants' unlawful actions, as described herein, directly infringe upon and substantially burden Plaintiffs' rights to free exercise of religion as guaranteed by the First Amendment of the United States Constitution and substantially burdens Plaintiffs' right to freely exercise the Roman Catholic religious faith.

125.    The March 2023 Defendant-DOS Rule's incorrect and unlawful interpretation of the Act unfairly targets, distinctively treats, and indiscriminately impacts Plaintiffs on account of Plaintiffs' religious beliefs, without any government interest.

126.    Defendants' unlawful actions, as described herein, that mandate and/or permit the disparate treatment of Plaintiffs and other similarly situated noncitizen religious workers does, did and will continue to deter individuals of ordinary firmness from openly exercising his or her right to practice his or her religion, forcing said individual's abandonment of his or her religion.

127.    Defendants' actions with respect to the March 2023 Defendant-DOS Rule are not narrowly tailored insofar as said actions are entirely and demonstrably ineffectual as obvious alternatives exist.

128.    Defendants' imposition of such burdens on Plaintiffs is not in furtherance of any government interest, let alone a compelling government interest, nor is it the least restrictive means of furthering any governmental interest, compelling or otherwise.

129.    As a result, Plaintiffs have suffered and will continue to suffer ongoing, actual, concrete, and particularized harm and psychological consequences on account of the abrupt March 2023 Defendant-DOS Rule and Defendants' enforcement of the March 2023 Defendant-DOS Rule.

## COUNT V

### PLAINTIFF-1 v. ALL DEFENDANTS
### VIOLATION OF THE FREE EXERCISE CLAUSE
### OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

130.    Plaintiffs incorporate Paragraphs 1 to 129 as set forth in full herein.

131.    The applicable regulations concerning concurrent filing of visa petitions and applications for adjustment of status, as written, interpreted, applied, and enforced against Plaintiff-1, a tax-exempt religious organization and employer, fundamentally restrict Plaintiff-1's right to participate on an equal basis in programs offered by the United States Government that otherwise benefit non-religious organizations.   See 8 C.F.R. § 245(a)(2)(i)(B).   This policy is subject to strict scrutiny and must end.

132.    The application of Section 245(a)(2)(i)(B), Title 8, Code of Federal Regulations, to Plaintiff-1 materially changed upon the implementation and application of the March 2023 agency action implemented by Defendant-DOS and enforced by Defendants.

133.    Likewise, Defendant-USCIS' application of Section 1356(u), Title 8, United States Code, against Plaintiff-1 fundamentally exposes Plaintiff-1 to excessive processing delays by precluding religious employers, including Plaintiff-1, from premium processing service.   See 8 U.S.C. § 1356(u).

134.    Given that Defendant-USCIS does not provide methods or otherwise maintain policies for religious employers to access its premium processing service, nor concurrently process applications for immigration benefits filed on behalf of ministers and religious workers employed by Plaintiff-1, Defendant-USCIS' policies violate the First Amendment of the United States Constitution's Free Exercise Clause.   See U. S. CONST. amend. I.   In doing so, Defendants' application of said regulation is subject to strict scrutiny.

## COUNT VI

**ALL PLAINTIFFS v. ALL DEFENDANTS**
**VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE**
**OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSITUTION**

135.    Plaintiffs incorporate Paragraphs 1 to 134 as though set forth in full herein.

136.    The right to freely exercise and practice religion is a fundamental right afforded by the First Amendment of the United States Constitution.  See U. S. CONST. amend. I (stating that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .).

137.    The liberty interest in pursuing a lawful occupation and a livelihood of an individual's choosing is rooted in the Due Process Clauses of the Fifth and the Fourteenth Amendments of the United States Constitution and has been further developed through legal precedent to protect individuals from arbitrary and unreasonable government interference in their chosen professions.  See e.g., Meyer v. Nebraska, 262 U.S. 390 (1923); see also U.S. CONST. amend. V (mandating that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law. . . ."; U.S. CONST. amend. XIV Sec. 1 (holding that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

138.    Defendant DOS' reinterpretation and misinterpretation and Defendants' use and enforcement of the process for visa allocations for religious workers under the EB-4 nonimmigrant visa preference and the unequal application of the same on account of the national origin-based Visa Bulletin and religious beliefs is discriminatory, arbitrary, unreasonable, and improperly motivated, which lacks any legitimate, rational, or compelling government interest.

-44-

139.   The Act states that, except as specifically provided in Title 8, Sections 1101(a)(27) (relating to special immigrants), 1152(b)(2)(A)(i) (concerning per level country levels for immigrant visa issuance), and 1153 (concerning allocation of immigrant visas for immediate relatives), United States Code, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  8 U.S.C. § 1153.

140.   Individual-Plaintiffs are similarly situated to nationals of all other countries in that all other countries are subject to per-country limits equally, and the per-country limitations serve to apportion immigrant visas to ensure immigrant visa availability in a given fiscal year to all nationalities.  See 8 U.S.C. § 1153(g).

141.   The March 2023 Defendant-DOS Rule's unfounded misinterpretation of the applicable law did, is now, and will continue to cause immediate and irreparable harm to religious workers due to the arbitrary, capricious, and unlawful recalculation of visa allocation.  There exists no legitimate or compelling purpose for the March 2023 Defendant-DOS Rule's interpretation, or, better put, of Title 8, Section 1152(a)(2), United States Code, particularly given that the action of Defendant-DOS created and continues to create substantial backlogs of the issuance of immigrant visa and serves only to disrupt the ability of Plaintiffs to protect Plaintiffs' continuing interests and the ability to effectuate those interests.

142.   The impact of the March 2023 Defendant-DOS Rule has already created, now creates, and will continue to create discrimination against Plaintiffs – religious workers and a religious organizations – that  is not narrowly tailored to advance or protect any legitimate, important, or compelling federal government interest.

-45-

143.    Defendants' actions explicitly discriminate against Plaintiffs on account of their status as nonimmigrant religious workers and, more generally, as religious workers and a religious organization which implicates a fundamental right afforded by the First Amendment of the United States Constitution, more specifically, the provision that prohibits the federal government from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof [. . .]" U. S. CONST. amend. I.

144.    By and through the March 2023 Defendant-DOS Rule that unlawfully, arbitrarily, and incorrectly recalculated the EB-4 immigrant preference category, and Defendants' enforcement of the same, Defendants have inflicted, now inflict, and will continue to inflict significant harm on nonimmigrant religious workers and religious organizations that rely on the statutorily limiting R-1, nonimmigrant visa category.  Accordingly, Defendants have obstructed, now obstruct, and will continue to obstruct the pursuit of Plaintiffs as Roman Catholics, Roman Catholic religious workers, such as Roman Catholic Priests, and the Roman Catholic Church itself, which are all bound to serve at the spiritual direction of the global leader of the Roman Catholic Church, His Holiness, the Pope, Bishop of Rome, whom together with the Bishops of each Roman Catholic Diocese, dictate as the Lord Jesus Christ so informs each, in accordance with the Code of Canon Law, Book II (the People of God), Part I  (the Christian Faithful), Titles I, II, and III.

145.    The March 2023 Defendant-DOS Rule and Defendants enforcement of said Rule further discriminates against Individual-Plaintiffs livelihoods, religious vocations, and the spiritual call to serve the Lord Jesus Christ as Roman Catholic Priests, which are all life and liberty interests that are intertwine with the Substantive Due Process Clause of the Fifth Amendment of the United States Constitution.  U.S. CONST. amend. V.

146.    Defendants' actions, as described herein, individually, and collectively, constitute a substantive unlawful discriminatory scheme and policy, which violate the Substantive Due Process Clause of the Fifth Amendment of the United States Constitution.  U.S. CONST. amend. V.

147.    But for the herein described violations of the Substantive Due Process Clause of the Fifth Amendment and the Fourteenth Amendment of the United States Constitution, Individual-Plaintiffs would be permitted to lawfully remain in the United States to continue practicing and preaching the Roman Catholic beliefs and faith pending the approval of the EB-4 nonimmigrant visa preference requests, which will allow Plaintiff-1 to continue to serve, without interruption, hundreds of thousands of Roman Catholics within the jurisdiction of Plaintiff-1, as the Code of Canon Law so mandates.  See Code of Canon Law, c. 369 (stating that a "diocese is a portion of the people of God which is entrusted to a bishop for him to shepherd with the cooperation of the presbyterium, so that, adhering to its pastor and gathered by him in the Holy Spirit through the gospel and the Eucharist, it constitutes a particular church in which the one, holy, catholic, and apostolic Church of Christ is truly present and operative."); see also Code of Canon Law, c. 372 §1 (holding that, "[a]s a rule, a portion of the people of God which constitutes a diocese or other particular church is limited definite territory so that it includes all the faithful living in the territory.").

148.    As a result of the discriminatory actions of Defendants, including the implementation and enforcement of the March 2023 Defendant-DOS Rule, Plaintiffs have suffered, now suffer, and will continue to suffer ongoing, actual, concrete, financial, spiritual, particularized harm, and psychological consequences, including, but not limited to legal fees, travel expenses, an inability to serve hundreds of thousands of Roman Catholics, significant

spiritual declination within the community served, loss of pursing a livelihood of Individual-Plaintiffs' livelihood of choosing, and loss of the rights to establish a religion, by and through Plaintiff-1, without interference, and to freely practice the Roman Catholic religious, by and through Plaintiff-1 and Individual-Plaintiffs.

149.    Defendant DOS' reinterpretation of the process governing visa allocations for religious workers is discriminatory, arbitrary, unreasonable, and improperly motivated.   The current interpretation of the law and subsequent use and enforcement of the national origin-based Visa Bulletin, incorporated chart, and uncertain calculations made therein to determine the allocation of visas lacks a rational basis and cannot be justified by a legitimate or compelling government interest.

150.    The Act states that except as specifically provided in Title 8, Section 1152(a)(2), United States Code (the per-country limit), and a section dealing with special immigrants, as well as provisions for immediate relatives (classes which are exempt from numerical limitations), that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

151.    No legitimate purpose is served by Defendant-DOS' unfounded misinterpretation of the applicable law to cause immediate and irreparable harm to religious workers due to the recalculation of visa allocation.  No legitimate purpose can be served by the 2023 misinterpretation of Section 202(a)(2) of the Act, especially given that it creates substantial backlogs of visa issuances and serves to disrupt the ability of religious organizations to serve their ongoing interests and Plaintiffs to effectuate those interests.  The impact of the Defendants' interpretation creates

unwarranted discrimination against religious workers, which is not narrowly tailored to advance any legitimate, important, or compelling government interest.

152.    Defendants' actions explicitly discriminate against Plaintiffs on the basis of their status as nonimmigrant religious workers, which necessarily implicates a fundamental right afforded by the First Amendment.  By misinterpreting the Act to recalculate and enforce new visa availability calculations, Defendants have inflicted significant harm on nonimmigrant religious workers and religious organizations which rely on the R-1 nonimmigrant visa category with statutorily limited periods of stay, thereby obstructing their pursuit of Catholic religious vocation in the United States.  These actions also discriminate on account of livelihood and vocation, a liberty interest intertwined with the Fifth Amendment Due Process Clause.

153.    The actions of Defendants constitute a substantive unlawful discriminatory scheme and policy in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.  But for the described constitutional violations, individual Plaintiffs would be able to lawfully remain in the United States to continue practicing their religious vocation pending their visa application approval and Plaintiff-1 would be able to continue to serve its community through its clergy.

154.    Because of the discriminatory nature of the actions of Defendants, Plaintiffs have had to expend substantial time and significant resources, and have suffered additional harm, including, but not limited to, legal fees, travel expenses, loss of the right to provide religious services to the members of the Roman Catholic Faith within the jurisdiction of the Roman Catholic Diocese of Paterson, violations of the Code of Canon Law as to the responsibilities of Plaintiffs to serve the members of the Roman Catholic Faith within the jurisdiction of the Roman Catholic

Diocese of Paterson, loss of pursuing a livelihood of their choosing, and loss of the right to freely practice and exercise their religion.

155.     As a result of the discriminatory scheme of Defendants, Plaintiffs have suffered, now suffer, and will continue to suffer losses as set forth hereinabove.

## COUNT VII

**ALL PLAINTIFFS v. ALL DEFENDANTS**
**VIOLATION OF THE PROCEDURAL DUE PROCESS CLAUSE**
**OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

156.     Plaintiffs incorporate Paragraphs 1 to 155 as though set forth in full herein.

157.     The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from denying persons the equal protection of the laws.  U.S. CONST. amend. XIV, § 1.3.  The Fifth Amendment Due Process Clause fundamentally incorporates a procedural notice requirement.

158.     Under the Due Process Clause of the Fifth Amendment, notice must be reasonably calculated under the circumstances to inform interested parties of a change in the law.

159.     Plaintiffs' religious rights have been deprived of fair warning implicit in the Due Process Clause due to Defendants' vague language contained in its new interpretation of the visa allocation process.

160.     Plaintiffs' religious rights have also been deprived of fair warning implicit in the Due Process Clause due to the retroactive application of Defendants' new interpretation of the visa allocation process.

161.     Defendant-DOS, directly through its actions related to the March 2023 agency action, failed to provide the appropriate notice and public comment period for a substantive rule

published in the Federal Register, in violation of the APA and procedural due process notice requirements implicit in the Fifth Amendment of the United States Constitution.

162.    But for the described constitutional violations, individual Plaintiffs would be able to lawfully remain in the United States to continue practicing their religious vocation pending their visa application approval.

163.    Because of the deprivations caused by the actions of Defendants, Plaintiffs have had to expend substantial time and significant resources, and have suffered additional harm, including, but not limited to, legal fees, travel expenses, loss of the right to provide religious services to the members of the Roman Catholic Faith within the jurisdiction of the Roman Catholic Diocese of Paterson, violations of the Code of Canon Law as to the responsibilities of Plaintiffs to serve the members of the Roman Catholic Faith within the jurisdiction of the Roman Catholic Diocese of Paterson, loss of pursuing a livelihood of their choosing, and loss of the right to freely practice and exercise their religion.

164.    As a result of the deprivation of rights caused by Defendants, Plaintiffs have suffered, now suffer, and will continue to suffer losses as set forth hereinabove.

## COUNT VIII

### ALL PLAINTIFFS v. ALL DEFENDANTS
### VIOLATION OF THE EQUAL PROTECTION CLAUSE
### OF THE FIFTH AMEDNMENT OF THE UNITED STATES CONSTITUION

165.    Plaintiffs incorporate Paragraphs 1 to 164 as though set forth full herein.

166.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from denying persons the equal protection of the laws.  U.S. CONST. amend. XIV, § 1.3.   The current interpretation of the law and subsequent use and enforcement of the national origin-based Visa Bulletin, incorporated chart, and calculations made

therein to determine the allocation of visas lack a rational basis and cannot be justified by a legitimate government interest.

167.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from denying persons the equal protection of the laws.  U.S. CONST. amend. XIV, § 1.3.  The use of the national origin-based Visa Bulletin chart to determine the allocation of visas lacks a rational basis and cannot be justified by a legitimate government interest.

168.    The Act states that except as specifically provided otherwise, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

169.    Individual Plaintiffs are subject to per-country limits equally, and the per-country limitations serve to apportion immigrant visas to ensure immigrant visa availability in a given fiscal year to all nationalities.  The government's use of the national origin-based Visa Bulletin charts is permissible to serve this limited legitimate government interest.

170.    Defendants' actions have resulted in a clear violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.  Defendants' actions constitute a discriminatory scheme and policy, explicitly discriminating against individual Plaintiffs based on their status as nonimmigrant religious workers subject to the EB-4 preference category, necessarily implicating a fundamental right protected by the First Amendment.  By misinterpreting the Act to recalculate and enforce new visa availability calculations, Defendants have unfairly harmed nonimmigrant religious workers, hindering their pursuit of their religious vocation in the United States.  Moreover, these actions also discriminate on the basis of livelihood and vocation, which is a Constitutionally protected liberty interest.

171.    No legitimate purpose is served by Defendant DOS' unfounded misinterpretation the applicable law to cause immediate and irreparable harm to nonimmigrant religious workers due to the recalculation of visa allocation.  No legitimate purpose can be served by the 2023 misinterpretation of Section 1152(a)(2) of Title 8, United States Code, especially given that it creates substantial backlogs of visa issuances and serves to disrupt the ability of religious organizations to serve their ongoing interests and Plaintiffs to effectuate those interests.  The impact of Defendants' interpretation creates unwarranted discrimination against nonimmigrant religious workers and their religious employers, which is not narrowly tailored to advance any important or compelling government interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for and respectfully request that this Honorable Court enter an Order as follows:

(a)    A speedy hearing of this action pursuant to Rule 57 of the Federal Rules of Civil Procedure;

(b)    Declaratory relief, upon good cause shown, that Defendants' policies, practices, and customs violate the First and Fifth Amendments to the United States Constitution;

(c)    Declaratory relief, upon good cause shown, that Defendants' policies, practices, and customs unconstitutionally discriminate against Plaintiff-1 as a religious employer;

(d)    Declaratory relief, upon good cause shown, equitably tolling unlawful presence for Plaintiffs and those nonimmigrant ministers and religious workers similarly situated as set forth

in Section 1182(a)(9)(B)(ii) of Title 8, United States Code, retroactively applied to the effective date of the March 28, 2023, agency action;

(e)     Declaratory relief, upon good cause shown, affording Plaintiff-1 and those religious employers similarly situated immediate access to immigration benefits afforded to non-religious employers by Defendants;

(f)     An injunction that requires Defendants to remedy the constitutional violations identified above, including a prohibition of Defendants' enforcement of the March 2023 rule promulgated in the Federal Register until compliant with the requirements under the Administrative Procedures Act, 5 U.S.C. § 701 et seq.;

(g)     An award of attorneys' fees, costs, and expenses of all litigation, pursuant to Section 2412, Title 28 of the United States Code; and

(h)     Such other further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs, by and through their undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action.

Respectfully Submitted:

**NORRIS McLAUGHLIN, P.A.**

Dated: <u>August 8, 2024</u>

<u>/s/ Robert Mahoney</u>
Robert Mahoney, Esquire
400 Crossing Boulevard
8th Floor
Bridgewater, NJ 08807
P:      (908) 722-0700
F:      (908) 722-0755
E:      rmahoney@norris-law.com

Dated: <u>August 8, 2024</u>

<u>/s/ Raymond G. Lahoud</u>
Raymond G. Lahoud, Esquire
515 West Hamilton Street
Suite 502
Allentown, PA 18101
P:      (212) 904-0285
F:      (610) 628-2481
E:      rglahoud@norris-law.com

*\* Motion for Admission Pro Hac Vice
Forthcoming*

Dated: <u>August 8, 2024</u>

<u>/s/ J. Alexander Short</u>
J. Alexander Short, Esquire
515 West Hamilton Street
Suite 502
Allentown, PA 18101
P:      (212) 904-0285
F:      (610) 628-2481
E:      jashort@norris-law.com

*\* Motion for Admission Pro Hac Vice
Forthcoming*

*Attorneys for Plaintiffs*